**Dirk and Cynthia BRADLEY, Individually and as Next Friends for Their Minor Son Brad Alan Bradley, Plaintiffs–Appellants,**

v.

**UNITED STATES of America, Defendant–Appellee.**

No. 87–1668.

United States Court of Appeals, Fifth Circuit.

Feb. 21, 1989.

Ronald E. James, Jack E. Morris, Benson, Pantello, Morris & James, Fort Wayne, Ind., Kae Brockermeyer, Fort Worth, Tex., for plaintiffs-appellants.

Mattie Peterson Compton, Asst. U.S. Atty., James A. Rolfe, U.S. Atty., Fort Worth, Tex., for defendant-appellee.

Before KING, WILLIAMS, and SMITH, Circuit Judges.

PER CURIAM:

Plaintiffs Dirk and Cynthia Bradley appeal from a take-nothing judgment entered after a bench trial on their claim under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b) and 2671 *et seq.*, against the United States for medical malpractice. We conclude that the government purposefully disregarded—indeed, had a *policy* of disregarding—its duties under the Federal Rules of Civil Procedure, the district court's own local rules, and the court's pretrial order seasonably to identify for the Bradleys the expert witnesses whose testimony it intended to present at trial. For that reason, we vacate and remand.

I.

While her husband was stationed at Carswell Air Force Base ("AFB") near Fort Worth, Texas, Cynthia consulted Dr. Anthony Fasano, a member of the medical staff of the base hospital, on November 7, 1977. Cynthia told Fasano that she had discontinued using birth control pills in May 1977, after which she had had normal menstrual periods in late May and June, that she did not have a menstrual period in

July, and that she experienced heavy bleeding in the first week of August. After recording this information and examining Cynthia, Fasano told her that she was 10 to 12 weeks pregnant.

Because Cynthia had delivered a previous child by cesarean section, Fasano and the other doctors who would later become involved in Cynthia's case informed her that she should again deliver by way of an elective, non-emergency cesarean section. The standard practice for performing a repeat cesarean section was to operate before Cynthia went into labor; at the same time, however, the doctors wished to avoid performing the cesarean section too early, lest the infant be delivered prematurely. Thus, estimating the gestational age of Cynthia's fetus became of the utmost importance. Based upon his initial observations, Fasano recorded in Cynthia's medical records that her estimated date of confinement (EDC) was May 14, 1978.

Cynthia saw Fasano again on December 5, 1977, at which time he estimated the fetus to be at 17 weeks gestation. At her third visit on January 3, 1978, Fasano reported that he did not hear any fetal heart tones and that the fetus was at 21 weeks gestation. One week later, however, Fasano reported that he could hear fetal heart tones, that Cynthia's uterus was at her umbilicus, and that the fetus had an estimated gestational age of 21 weeks.

On April 5, 1978, Fasano, noting that the date of Cynthia's last menstrual period was uncertain, requested that an ultrasound examination be performed. Prior to the performance of the ultrasound, Cynthia met with Dr. Vernon Hayes, who, after reviewing her records, determined her EDC to be May 14, 1978, and scheduled her for delivery by cesarean section on May 10, 1978.

Dr. John Coscia, a radiologist, performed the ultrasound requested by Fasano on April 12, and, based upon his measurements, estimated the fetus to be at 35 weeks gestation. On April 28, Fasano again examined Cynthia, estimated her fundus at 39 centimeters, and noted that the "sonogram matches dates exactly."

On May 9, 1978, Cynthia was admitted to the Carswell AFB Hospital. When she was admitted, Dr. Thomas Johnson, Chief of Obstetrics and Gynecology at the hospital, and Dr. Carlos de la Garza both reviewed her charts and confirmed that her EDC as May 14, 1978. One day later, de la Garza, with Fasano and Johnson in attendance, performed a cesarean section on Cynthia.

Brad Alan Bradley was born at 8:08 a.m. on May 10, 1978, weighed 2500 grams, and, according to a Dubowitz exam, had a gestational age of 35–36 weeks, indicating that he had been delivered prematurely. At birth, he was suctioned, began to breath spontaneously, and exhibited a one-minute Apgar score of 9.[1] Shortly thereafter, he suffered severe respiratory distress, resulting in asphyxia when his respirations ceased and his heart rate fell below 60; although he was immediately intubated and resuscitated, his five-minute Apgar score was 4. Because the hospital did not have the facilities to care for a premature infant, Brad was transferred to a neonatal intensive care unit at another hospital, where he remained until May 15, 1978.

According to the district court, Brad's condition was "uneventful" until April 1979, at which time the Bradleys began to notice abnormalities in his development. In August 1979, Brad suffered a seizure requiring hospitalization; a CAT scan revealed that Brad had a large lesion on the left side of his brain caused by an intracranial hemorrhage. It is now certain that Brad suffers from multiple handicaps, including epilepsy, mental retardation, and cerebral palsy, and will require significant care for the remainder of his life.

## II.

The Bradleys, after complying with the notice provisions of the FTCA by filing an administrative claim on March 29, 1981, filed the instant suit on March 5, 1984, alleging that the government's doctors negligently scheduled and performed Brad's

---

**1.** An Apgar score is based upon an infant's heart rate, respiratory effort, muscle tone, reflex irritability, and color. The higher the score, up to 10, the better the condition of the infant.

delivery by cesarean section. On July 17, 1984, the Bradleys served upon the government interrogatories that requested, *inter alia*, that the government identify "each expert witness whose opinion the Defendant intends to present at [ ] trial," and all of the articles, journals, books, or other sources which the government or its experts intended to assert as authoritative.

The government responded to the interrogatories on September 18, 1984. In answer to the Bradleys' request that it identify its expert witnesses, the government stated: "The Defendant has not selected an expert at this time." Similarly, in response to the Bradleys' request that it identify all authoritative secondary sources which it intended to use at trial, the government, after identifying a standard medical treatise on obstetrics, J. Pritchard & P. MacDonald, *Williams Obstetrics* (1976), stated that, because it "has not selected an expert at this time [ ] it has therefore not yet selected any articles, journals or other publications as authoritative." These answers were never subsequently altered or amended.

On January 17, 1985, the court ordered that, in accordance with local rules, the parties were to prepare and present to the court a pretrial order by June 10, 1985, and that the case be set for trial on June 24, 1985. The parties submitted a pretrial order to the court on June 10, 1985, in which the government, having been ordered to list all of the expert witnesses it intended to call at trial, again failed to identify any expert witnesses.

Although both parties appeared before the court on June 24, 1985, and announced their readiness to go to trial, the trial was postponed and rescheduled for March 24, 1986, with a joint pretrial order due on March 14, 1986. Neither party amended the joint pretrial order previously submitted to the court, and no new pretrial order was filed; on March 17, 1986, the trial was postponed a second time until July 21, 1986. Finally, on May 22, 1986, the trial was postponed a third time until February 2, 1987, with a joint pretrial order due January 16, 1987.

At no time during these various postponements did either party seek to amend the pretrial order submitted on June 10, 1985, and no new pretrial order was filed prior to the February 2, 1987, trial date. On January 23, 1987, however, the government moved to designate two expert witnesses—a Dr. Alvin Brekken and a Dr. William R. Bernell—out of time. The Bradleys, while filing papers opposing the government's motion, quickly deposed the two witnesses.

On Monday, February 2, 1987, both parties appeared, ready for trial. Although they stated that under the circumstances they did not want the trial to be postponed yet a fourth time, the Bradleys continued to oppose the government's motion. Noting that the Bradleys already had deposed the two witnesses, however, the court granted the government's motion and allowed Brekken and Bernell to testify.

After the trial, the court rendered judgment for the United States. In its findings of fact and conclusions of law, the court concluded that the Bradleys had failed to prove both that the Air Force doctors were negligent in scheduling Brad's delivery and that the doctors' actions were the proximate cause of his handicaps. The Bradleys appeal, contending (1) that the court erred by granting the government's motion to designate the two expert witnesses and allowing them to testify, and (2) that the court's factual findings are clearly erroneous.

### III.

■ Under Fed.R.Civ.P. 26(e)(1), a party has a duty seasonably to supplement [its] response [to a request for discovery] with respect to any question directly addressed to ... the identity of each person expected to be called as an expert witness at trial, the subject matter on which the person is expected to testify, and the substance of the person's testimony.

Even the government admits that, at least

as to Bernell, it breached this rule;[2] moreover, there is little question that the government failed to comply with either the local rules of the district in which the case was tried[3] or the court's pretrial order,[4] both of which required it to designate its expert witnesses within a certain period.

■ The breach having been established, the only question remaining is that of remedy. While the government moved to designate the two expert witnesses out of time, the Bradleys moved to exclude the witnesses under rules 16(f)[5] and 26(e)(1).[6]

On the first day of trial, the court, after discussing the factual circumstances underlying the motions with counsel, ruled from the bench that the two experts would be allowed to testify. It is this ruling which the Bradleys contest.

■ Regardless of whether we treat the court's ruling as an amendment of the pretrial order under rule 16(e) or a refusal to impose sanctions upon the government for violating rule 26(e)(1), it is apparent that we must review the court's ruling under the "abuse of discretion" standard.[7] The

---

2. Although it offers no excuse for its failure to identify Bernell, the government did suggest to the trial court that in June 1985 it had informed the Bradleys' counsel by telephone that it intended to call Brekken as an expert witness. According to the Bradleys' counsel, however, the conversation took place while the parties' counsel were preparing the original pretrial order in which the government did not list any expert witnesses. Thus, the Bradleys' counsel interpreted the reference to Brekken by the government's counsel as meaning that the government was planning to use Brekken only as a consultant, not as an expert witness.

We need not decide this dispute to determine that the government's conduct with regard to Brekken falls woefully short of fulfilling its duty under the rule. An ambiguous reference to a witness over the telephone is no substitute for the written, formal response called for by the rules, as is evidenced by the confusion and misunderstandings in this case. We thus perceive no difference, on the facts of this case, between the government's total failure to notify the Bradleys that it intended to use Bernell as an expert witness and its obviously inadequate efforts to notify the Bradleys that it intended to use Brekken as a witness.

3. Local Rule 8.1(c) for the Northern District of Texas provides that "[u]nless otherwise directed by the Presiding Judge, each party shall file a written designation of its experts at least ninety (90) days before trial." There is no indication that the court did "otherwise direct," unless the court's pretrial order superseded the rule. Even if it did, the government's failure to comply with the pretrial order means that it has merely hopped out of the frying pan and into the fire.

4. That the pretrial order is binding upon the government's conduct at trial is well established. See Fed.R.Civ.P. 16(e) ("[The pretrial] order shall control the subsequent course of the action unless modified by a subsequent order. The order following a final pretrial conference shall be modified only to prevent manifest injustice."); Trinity Carton Co. v. Falstaff Brewing Corp., 767 F.2d 184, 192 n. 13 (5th Cir.1985), cert. denied, 475 U.S. 1017, 106 S.Ct. 1202, 89

L.Ed.2d 315 (1986); Lirette v. Popich Bros. Water Transp., Inc., 660 F.2d 142, 144 (5th Cir. Oct.1981).

5. Fed.R.Civ.P. 16(f) provides that

[i]f a party or a party's attorney fails to obey a scheduling or pretrial order ... the judge, upon motion or the judge's own initiative, may make such orders with regard thereto as are just....

6. We note that, unlike rule 16(f), rule 26(e)(1) does not explicitly grant the court authority to sanction parties for violations. The advisory committee note accompanying the rule suggests that such authority is implicitly granted by the rule itself:

The duty will normally be enforced, in those limited instances where it is imposed, through sanctions imposed by the trial court, including exclusion of evidence, continuance, or other action, as the court may deem appropriate.

An alternative explanation is that the rule assumes that courts have the inherent authority to enforce their own rules. See 8 C. Wright & A. Miller, Federal Practice & Procedure § 2050 at 325–26 (1970). In any case, the power of a trial court to impose sanctions for rule 26(e)(1) violations has been affirmed repeatedly by this court and others. See Murphy v. Magnolia Elec. Power Ass'n, 639 F.2d 232, 234–35 (5th Cir.1981); Outley v. City of New York, 837 F.2d 587, 590 (2d Cir.1988); Alimenta (U.S.A.), Inc., v. Anheuser–Busch Cos., 803 F.2d 1160, 1163 (11th Cir. 1986). Cf. In re Thalheim, 853 F.2d 383, 388 (5th Cir.1988) (court must follow its own rules in imposing discipline).

7. See National Hockey League v. Metropolitan Hockey Club, Inc., 427 U.S. 639, 642, 96 S.Ct. 2778, 2780, 49 L.Ed.2d 747 (1976); Sexton v. Gulf Oil Corp., 809 F.2d 167, 170 (1st Cir.1987) (decision whether to exclude an expert witness not named in the pretrial order is left to the broad discretion vested in the district court by rule 16); Murphy v. Magnolia Elec. Power Ass'n, 639 F.2d at 234–35 (concluding that "the district judge enjoys considerable discretion in deter-

trial court's discretion, however, is to be guided by the consideration of four factors: (1) the importance of the witness's testimony; (2) the prejudice to the opposing party of allowing the witness to testify; (3) the possibility of curing such prejudice by granting a continuance; and (4) the explanation, if any, for the party's failure to identify the witness. *See Murphy*, 639 F.2d at 235. Based upon our analysis of these factors, we conclude that this is one of those rare cases in which we are compelled to hold that the trial court abused its discretion by allowing Brekken and Bernell to testify.

### A. *The Importance of the Experts' Testimony.*

Both parties agree that the testimony of Brekken and Bernell went to the central issues of the case, and was equally central to the government's conduct of the trial. Brekken, an experienced and well-qualified obstetrician, testified to the standard of care that existed at the time of Brad's birth and expressed his opinion that Cynthia's doctors' actions met that standard. Bernell, an experienced neurosurgeon, was the only government witness on the issue of causation. The testimony of both doctors played a prominent role in the district court's findings of fact and conclusions of law. In sum, the two doctors' testimony was highly relevant; exclusion would no doubt be a particularly strong remedy.

### B. *Potential Prejudice to the Bradleys.*

There is little doubt that the government's conduct placed the Bradleys at a disadvantage at trial. Strictly speaking, Brekken and Bernell were not "surprise witnesses" in the classic sense, insofar as the Bradleys had pretrial notice of the government's intention to offer their testimony and had the opportunity to depose

them immediately prior to trial. Thus, because the Bradleys' counsel responded so quickly to the government's belated announcement that it did indeed intend to call expert witnesses, it is impossible to conclude that the government's conduct rendered the trial fundamentally unfair.

The government's conduct nonetheless put the Bradleys at a distinct disadvantage throughout the trial. Because they could not depose Brekken and Bernell until approximately 2–3 days before trial, the Bradleys had very little time in which to prepare their cross-examination.

Even more importantly, because of the government's tactics in delaying its designation, the Bradleys' ability to adapt the presentation of their case was effectively destroyed. Because of the numerous postponements and the difficulty of getting witnesses to appear at trial, the Bradleys' attorney had deposed all of their witnesses except for the Bradleys shortly before the February 2, 1987, trial date, with the intention of offering the depositions at trial in lieu of personal appearances. Thus, thinking that they knew how the government intended to proceed at trial, the Bradleys, with the full knowledge of the government, "locked in" their own case. In essence, the government stood by and watched while the Bradleys unwittingly deprived themselves of their ability to respond to the government's future revelations.

### C. *The Possibility of a Continuance.*

Only a continuance would have given the Bradleys the time to adapt their own case, by either redeposing their own witnesses or making arrangements for them to appear at trial, and to prepare an effective cross-examination of the two witnesses. Although far from a perfect solution in this case,[8] a continuance would have allowed the Bradleys to cure all potential prejudice

---

mining when [sanctions for violating rule 26(e)(1) can be] properly imposed").

**8.** The trial had already been postponed three times over the two years preceding the date of the actual trial. Each party had undoubtedly incurred significant expense in preparing for the postponed trials, and the court was probably

reluctant to postpone the case again, particularly when the parties were present and ready to proceed but for these two witnesses. The Bradleys' counsel was therefore likely speaking for both the parties and the court when he said that "[w]e do not want to postpone this trial."

that may have resulted from the government's conduct, as this is not a case in which the passage of time destroyed evidence or otherwise permanently impaired a party's ability to mount a full and fair defense to the new evidence. We also note, however, that a continuance would neither punish the government for its conduct nor deter similar behavior in the future.

### D. *The Government's Explanation for Its Conduct.*

■ According to the government, its failure to notify the Bradleys of its expert witnesses in accordance with the federal and local rules and the court's pretrial order was the result of budgetary constraints and bureaucratic policy. As the Assistant United States Attorney trying the case explained orally to the district court, and to this court in writing, each United States Attorney's Office is provided with litigation funds, which can be used, *inter alia*, to hire consultants to assist in the preparation of a case. In this case, both Brekken and Bernell were hired as consultants, with Brekken delivering a written report to the government in June 1984—well before the government responded to the Bradleys' interrogatories—and Bernell delivering a written report in June 1985, before the original pretrial order was filed in the district court.[9]

Funds for the payment of expert witnesses, however, are maintained centrally at the Department of Justice. Once an Assistant United States Attorney who wishes to use an expert at trial obtains permission from the Department of Justice, funds for the payment of that witness are restricted in the expert witness account, and are no longer available for use by any other Assistant United States Attorney, even though the trial for which the expert is designated may not occur for some time.

Assistant United States Attorneys therefore are encouraged not to "tie up" those funds until reasonably sure that the case in which the expert will testify is going to trial in the immediate future.

This policy of delaying the designation of expert witnesses, the government states, was particularly important during the time in which this case was pending. Because of severe budgetary problems, United States Attorneys' offices were instructed to forego a number of expense-generating activities; at the same time, district judges were instructed that, for a period of time, they could not proceed with any jury trials because funds were not available.

Thus, the government states, it did not supplement its responses to the Bradleys' interrogatories or designate Brekken and Bernell in the original pretrial order because it was Justice Department policy not to do so until trial was imminent. It does contend that it nonetheless informally notified the Bradleys in June 1985 of its intention to use Brekken as an expert witness, *see supra;* it offers no explanation, however, for its failure to inform them of its intention to use Bernell.

Even if we receive the government's explanation at face value, we simply cannot accept "bureaucratic necessity" as an excuse for purposefully disregarding the rules by which all parties must operate when appearing before federal district courts. All parties are expected to conform their conduct to these rules, or face sanctions for their failure to do so; this is even more true for the federal government, a party that regularly appears before the federal courts, knows the rules by which they operate, and is even at times a special beneficiary of those rules.[10] Although we are sensitive to the conditions under which the various United States Attorneys' offices operate, these conditions do not and

---

**9.** The record does not reveal when the government decided that it would use Brekken and Bernell as expert witnesses and not just as consultants. We do not consider it unlikely, however, that the government planned to use them as witnesses well before it decided officially so to designate them.

**10.** There are special rules, for example, governing the service of process upon the federal government, *see* Fed.R.Civ.P. 4(d)(4)–(5), and granting it additional time in which to reply to complaints filed against it. *See* Fed.R.Civ.P. 12(a).

cannot justify policies that are predicated upon a disregard of the power of federal courts and the rights of opposing parties, both of which are embodied in the federal rules, the local rules, and court orders.

By allowing Brekken and Bernell to testify, the district court left the government's breach of its duties unsanctioned; moreover, its silence in the face of the government's conduct can be interpreted as an imprimatur. Indeed, the letter submitted by the United States Attorney to this court suggests that the government has interpreted the district court's silence as precisely that, insofar as the letter indicates that the same policies are still in effect.

We will not allow that imprimatur to exist any longer. We hold that, under the circumstances of this case, the district court abused its discretion by allowing the government to designate Brekken and Bernell out of time and to offer their testimony.[11] Moreover, we are hopeful that this decision will serve as a catalyst for appropriate changes in the above-described policies, to the extent that such policies still deter adherence to the applicable rules.

## IV.

Having determined that the district court erred in allowing the government to present the testimony of Brekken and Bernell, we must now decide how the case should proceed. At the outset, we reiterate the importance of the two experts' testimony. Brekken provided the government's primary evidence as to how the guidelines in *Williams Obstetrics*, acknowledged by both parties as embodying the applicable standard of care at the time

of Brad's gestation and birth, should be interpreted, and whether the government's doctors' conduct was in keeping with that standard of care. Bernell was the government's sole witness as to causation; without his testimony, the factfinder is left to decide whether the Bradleys carried their burden of proof on the issue of causation only on the basis of testimony from the Bradleys' expert and questionable documentary evidence. In essence, the two experts "tied everything together" for the government, gathering bits of evidence gleaned from other sources and interpreting them as a whole in reference to the two main issues—negligence and causation—in the case.

The district court's findings reflect the importance of the two doctors' testimony, insofar as many of them expressly refer to the testimony and interpret other evidence in light of it. Under these circumstances, we cannot cure the error be reviewing only those findings that are independent of the improperly-admitted testimony.

Consequently, we think it best to put the parties into the position in which they would have been had the government complied with the rules and seasonably notified the Bradleys of its intention to call Brekken and Bernell. To do so, we first remand the case to the district court for a new trial on all issues, at which the government may present the testimony of Brekken and Bernell. Before the new trial is begun, of course, the district court should consider any further appropriate discovery and should allow the parties to prepare the presentation of their cases in light of the two experts' expected testimony.[12]

---

11. In so doing, we emphasize that our holding is not to be interpreted as meaning that exclusion of witnesses or evidence has supplanted continuance as the preferred means of dealing with a party's attempt to designate a witness out of time or offer new evidence. *See Conway v. Chemical Leaman Tank Lines, Inc.*, 687 F.2d 108, 112 (5th Cir.1982); *F & S Offshore, Inc. v. K.O. Steel Casting, Inc.*, 662 F.2d 1104, 1107–08 (5th Cir.1981); *Shelak v. White Motor Co.*, 581 F.2d 1155, 1159–60 (5th Cir.1978). Coupled with appropriate sanctions, a continuance will serve the court's truth-seeking function while still allowing it to punish and deter conduct that is in violation of the rules. Moreover, it re-

mains the province of the district court to determine, within the bounds of discretion, whether any sanctions are appropriate. To that extent, our holding here is fact-bound: These plaintiffs were put in the untenable position of either proceeding with improperly-designated adverse witnesses or agreeing, six years after filing their claim, to a fourth continuance.

12. We anticipate, for example, that the Bradleys will wish to redepose their expert witnesses, or arrange to have them testify in person, in order to counter the testimony of Brekken and Bernell. Similarly, the government may itself wish to depose the Bradleys' witnesses in preparation

Second, on remand the district court, pursuant to its inherent power to enforce its own rules, *see supra* note 6, should impose sanctions upon the government for the breach of its duties under the rules. In its discretion, the court may consider, for example, requiring the government to compensate the Bradleys and their counsel for their expenses attributable to the government's conduct.[13] Sanctions are necessary not just to compensate the Bradleys, but to ensure that the government's conduct does not go unpunished, as it would if the case were remanded merely for a new trial. *See Perkinson v. Gilbert/Robinson, Inc.,* 821 F.2d 686, 689–90 (D.C.Cir.1987) (affirming the imposition of monetary sanctions for violation of rule 26(e)(2)).

We thus VACATE the judgment of the district court and REMAND for further proceedings consistent with this opinion.

---

William A. Marshall, Asst. Dist. Atty., Harry Connick, Dist. Atty., New Orleans, La., for respondent-appellant.

Milton Reed, Angola, La., pro se.

Before CLARK, Chief Judge, GARZA and POLITZ, Circuit Judges.

for trial. These matters remain, of course, within the discretion of the district court.

**13.** Such expenses would include out-of-pocket costs and attorneys' fees for, e.g., opposing the government's motion to designate the two witnesses out of time, the first trial, this appeal, and redeposing expert witnesses. This list is not intended to be all-inclusive; rather, we leave it to the district court on remand to determine the types and amounts of the Bradleys' expenses for which the government might be made to pay in the form of sanctions, guided by the central goal of putting the Bradleys in the position they would have been in had the government complied with the rules.