Catherine MILLEN, as trustee for the heirs and next-of-kin of William P. Millen, deceased, Plaintiff,

v.

The MAYO FOUNDATION, a Minnesota Corporation, Defendant.

Civ. No. 4–95–771.

United States District Court, D. Minnesota, Fourth Division.

Nov. 7, 1996.

Mark A. Hallberg, Minneapolis, MN, for Plaintiff.

William R. Stoeri, Minneapolis, MN, for Defendant.

## ORDER

ERICKSON, United States Magistrate Judge.

### I. *Introduction*

This matter came before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. § 636(b)(1)(A), upon the Defendant's Motion to Strike the Plaintiff's supplemental designation of an expert witness.

A Hearing on the Motion was conducted on October 31, 1996, at which time the Plaintiff appeared by Mark A. Hallberg, Esq., and the Defendant appeared by William R. Stoeri, Esq.

For reasons which follow, the Motion to Strike is granted, in part, and denied, in part.

### II. *Factual and Procedural Background*

This is a medical malpractice action in which the Plaintiff alleges that the negligence of the Defendant caused the death of her husband, William P. Millen ("Millen"). In particular, the Plaintiff contends that the agents of the Defendant failed to adequately provide Millen with breathing therapy, known as continuous positive airway pressure ("CPAP"), and with an adequate, post-operative supply of oxygen. According to the Plaintiff, her husband suffered from obesity, and from sleep apnea, which would

cause him to unexpectedly stop breathing while sleeping. The Defendants deny any negligence in their provision of medical care to Millen.

By a Pretrial Order dated October 4, 1995, we directed that all discovery be completed by September 9, 1996, and that the Plaintiff make her expert witness disclosures by no later than June 3, 1996, with the Defendant's disclosures to be completed by no later than August 5, 1996. Consistent with this Court's customary practice, the parties were encouraged to submit any pretrial disputes, for the Court's resolution, as soon as they had met and conferred, and yet, continued at impasse. Notwithstanding this urging, we are informed that the parties disputed the scope of discovery, as it related to the taking of the depositions of the Defendant's nurses, who had treated Millen in the hours before his death. Although initially agreeing to a limitation of seven depositions—a limitation that was memorialized in the Court's Scheduling Order—the Plaintiff sought to depose thirteen nurses, who were in the Defendant's employ, and who were involved in the post-operative care of Millen. After literally *months* of wrangling over the matter, the Defendant agreed to the taking of those depositions, and they were completed in July of 1996.

Consistent with her obligations, under the Court's Scheduling Order, the Plaintiff disclosed her expert witness opinions on May 31, 1996. In those disclosures, the Plaintiff identified Dr. John Linner, who is a board-certified general surgeon, and Dr. Conrad Iber, who is board-certified in internal medicine, pulmonology, and critical care medicine. In the course of reciting his opinions, Dr. Linner has expressed the view that, in failing to provide Millen with supplemental oxygen, the Defendant's nursing staff provided medical services which were "below standard practice under the circumstances." According to the Plaintiff, "Dr. Linner is expected to testify that if [Millen] had been provided with CPAP and supplemental oxygen, he

most likely would have survived the post operative period and lived a normal life expectancy."

For his part, Dr. Iber is expected to testify that Millen required CPAP post-operatively and, if he refused CPAP, then he should have received oxygen therapy during the sleeping hours, and the failure to provide that therapy would fall "below accepted standards of medical practice under the circumstances." As related by the Plaintiff, "Dr. Iber is also of the opinion that the failure to provide standard medical care to [Millen] in the form of CPAP, cardiac monitoring, oximetry[1] and oxygen therapy was a direct cause, of [Millen's] death during the early morning hours of April 23."

In response to these medical opinions, the Defendant has timely disclosed the expert opinions of Dr. John C. Alverdy, who is board-certified in surgery and in critical care, of Dr. Richard E. Rauck, who is board-certified in anesthesiology, and of Dr. Peter Jebson, who is "experienced in the post-operative management of bariatric[s][2] surgery patients including those diagnosed with sleep apnea." In Dr. Alverdy's view, the Defendant's medical treatment of Millen did not depart "from the standard of care by Mayo physicians, nursing personnel, or other medical personnel in the care and treatment provided * * *." As to Dr. Rauck, he is of the opinion that the post-operative monitoring of Millen, including the use of pulse oximetry and cardiac monitoring, were acceptable and met the appropriate standard of care, and the refusal of Millen to wear oxygen "was handled appropriately by medical staff." Similarly, Dr. Jebson is expected to testify that the death of Millen "could have occurred at any time and was not caused by negligence on the part of Mayo medical personnel."

Then, as a catch-all, the Defendant's expert disclosures include the following:

All of the doctors, nurses, therapists, and other personnel who cared for [Millen] are persons with specialized knowledge who, if

---

1. Oximetry determines the oxygen saturation of arterial blood through the use of a photoelectric instrument. *Dorland's Illustrated Medical Dictionary,* p. 1207 (28th Ed.1994).

2. Bariatrics is the field of medicine which deals with the causes, prevention and treatment of obesity. *Dorland's Illustrated Medical Dictionary,* p. 183 (28th Ed.1994).

they testify, will testify as fact witnesses with expertise. Their testimony, Mayo expects, will be in accordance with their notes in the Mayo Clinic medical record, with their depositions (if applicable), Mayo's Answers and defense in this case denying negligence, and with the above disclosed opinions of Dr. Alverdy, Dr. Rauck, and Dr. Jebson.

What has generated this controversy, however, is the Plaintiff's proffer of a supplemental expert disclosure, which announces the anticipated testimony of Irene Grossbach ("Grossbach"), who is a pulmonary clinical nurse specialist at the Veterans Administration Medical Center, in Minneapolis, Minnesota. In Grossbach's opinion, the Defendant's nursing staff was negligent, in its care and treatment of Millen, by failing "to provide post operative hospital care that was consistent with accepted standards of medical and hospital practice."

According to Grossbach, the Plaintiff's decedent presented a continuing risk of obstructive sleep apnea and, as a consequence, "accepted standards of hospital practice required that he receive CPAP during his sleeping hours, that he receive supplemental oxygen and that his oxygen levels be monitored through pulse oximetry." Among other opinions, Grossbach is expected "to testify that the arterial blood gases obtained during the attempted resuscitation of [Millen] during the early morning hours of April 23, 1993 suggest that [he] was not receiving adequate oxygenation during the resuscitation efforts," and that, with "the proper placement of an endotracheal tube, adequate manual resuscitation on bag capabilities and proper mask ventilation technique, the oxygenation ($PaO_2$) and ventilation (pH, $PaCO_2$) should have improved substantially."

The Defendant contests the proffer of Grossbach's opinion testimony as it is, unquestionably, untimely. Notwithstanding our Scheduling Order, which directed that the Plaintiff disclose her expert testimony by no later than June 3, 1996, Grossbach's disclosures were not made by the Plaintiff until three months later—on September 5, 1996. In defense of this delinquency, the Plaintiff advises that the discovery dispute, which related to the taking of the nurses' depositions, effectively precluded the rendition of any responsible opinion, concerning the propriety of the nursing care of Millen, until those depositions were completed on July 23, 1996. In turn, the Defendant urges as follows:

> If the Court's Pretrial Orders and schedules are to mean anything, they must be enforced, especially in cases like this in which a party has treated its compliance with the pretrial schedule as a matter left to its own prerogative. Particularly with regard to expert disclosure deadlines, the enforcement of the pretrial schedule is important. * * * Because of notice pleading, medical malpractice defendants regularly do not know what medical actions or decisions will be criticized by a plaintiff's experts. Medical malpractice defendants must prepare their defenses and gather evidence in response to these later articulations of the claims against them. In this case, therefore, plaintiff has not only missed the Court's deadline, she has also frustrated the schedule's provisions in a material way.

By way of rejoinder, the Plaintiff counters:

> It is important to keep in mind that the purpose of the civil justice system, hopefully, is to obtain justice. Justice is the search for truth in an effort to resolve conflict. The discovery process, including the disclosure of expert witnesses, is a means for "ferreting" out the truth through interrogatories, document requests and depositions. However, by its very nature, discovery is a process which unfolds over time. The ability to retain and disclose expert testimony depends, in large part, on the ability to have access to all relevant facts on all issues involved in litigation. Rarely, if ever, do the parties, or their lawyers, have full knowledge of all facts or issues at the onset of the litigation. Consequently, the discovery process is used to obtain that knowledge.

While denying that the Defendant has been prejudiced by her unseasonable disclosure of Grossbach's opinions, the Plaintiff underscores that any prejudice could be offset by allowing the Defendant to retain and disclose a nursing expert at this time.

Stripped of the parties' respective rhetoric, the issue before us is one of fundamental fairness.

## III. *Discussion*

A. *Standard of Review.* Obedience to the constraints of the Scheduling Orders of the Court is critical, if the Court is to capably perform its case management responsibilities. *Tomlin v. Holecek*, 158 F.R.D. 132, 135 (D.Minn.1994); *Jochims v. Isuzu Motors, Ltd.*, 144 F.R.D. 350, 356 (S.D.Iowa 1992), citing *Gestetner Corp. v. Case Equipment Co.*, 108 F.R.D. 138, 141 (D.Me.1985). Accordingly, the "flouting of discovery deadlines causes substantial harm to the judicial system." *Jochims v. Isuzu Motors, Ltd.*, supra at 356. Nevertheless, blind adherence to the time constraints of a Scheduling Order, without a proper regard for the bases and effects of the noncompliance, may well be inconsistent with the dominant interest of a Trial in ascertaining the truth. *Dabney v. Montgomery Ward & Co.*, 692 F.2d 49, 52 (8th Cir.1982), cert. denied, 461 U.S. 957, 103 S.Ct. 2429, 77 L.Ed.2d 1316 (1983); *Bradley v. United States*, 866 F.2d 120, 127 n. 12 (5th Cir.1989).

Accordingly, our Court of Appeals has developed a flexible standard in order to preclude fundamental unfairness at the time of Trial. *Boone v. Moore*, 980 F.2d 539, 541 (8th Cir.1992), citing *Wilson v. Beloit Corp.*, 921 F.2d 765, 768–69 (8th Cir.1990). "Two similar tests, or sets of factors, have been used by the court to determine whether a witness's testimony should be excluded if that witness was not named in the pretrial order." *Marti v. City of Maplewood, Mo.*, 57 F.3d 680, 683 (8th Cir.1995). The first test was enunciated in *Patterson v. F.W. Woolworth Co.*, 786 F.2d 874, 879 (8th Cir.1986), where the Court looked to the following factors:

1. the reasons the party fails to name the witness;

2. the importance of the testimony;

3. the amount of time the opposing party needs to properly prepare for the testimony; and

4. whether a continuance would in some way be useful.

See also, *Citizens Bank v. Ford Motor Co.*, 16 F.3d 965, 966 (8th Cir.1994); *Boone v. Moore*, supra at 541–42.

The second test, which was formulated in *Morfeld v. Kehm*, 803 F.2d 1452, 1456 (8th Cir.1986), considers the following:

1. the prejudice or surprise in fact of the party against whom the excluded witness would have testified;

2. the ability of that party to cure the prejudice;

3. the extent to which waiver of the rule against calling unlisted witnesses would disrupt the orderly and efficient trial of the case or of other cases in the court;

4. bad faith or willfulness of the party failing to comply with the court's order.

See also, *Martinez v. Union Pacific R. Co.*, 82 F.3d 223, 227 (8th Cir.1996).

We apply an amalgam of these two tests in assessing the Plaintiff's failure to timely disclose Grossbach as an expert witness.

■ B. *Legal Analysis.* Under either test, we believe that the interests of justice are best served by allowing the testimony of Grossbach, if it is otherwise competent, at the time of Trial. Cf., *Dave Kolb Grading, Inc. v. Terra Venture Bridgeton Project Joint–Venture*, 85 F.3d 351, 355 (8th Cir. 1996). In reaching this conclusion, however, we expressly find that the Plaintiff has not advanced an acceptable justification for her failure to timely disclose Grossbach as an expert witness. Through the use of an "open door" policy,[3] we have taken pains to adapt the Court's, processes, so as to maximize the "Just, speedy and inexpensive determination" of any pretrial dispute. See, *Rule 1, Federal Rules of Civil Procedure.* Had the Plaintiff truly been interested in completing a "due diligence" exploration of the negligence, if any, of the Defendant's nursing staff, the

---

**3.** During the course of every Initial Pretrial Conference, we encourage the parties to meet and confer on pretrial disputes and, if that is unavailing, to jointly contact the Court, by telephone, in order that the disagreement may be timely resolved. Here, the parties elected to protract their dispute, with attendant increases in the costs and expense to all concerned.

means were readily available to do so by a prompt invocation of this Court's supervisory powers. While this factor does not, at first glance, militate in favor of the Plaintiff's position, we are unpersuaded that, in being an equal party to the delays that have occurred, the Defendant can legitimately claim any prejudice. Indeed, this seems particularly so where, as here, the Defendant ultimately acceded to the Plaintiff's requested scope of discovery.

■ In addition, we conclude, for other reasons, that the Defendant can responsibly claim no prejudice or surprise by the Plaintiff's disclosure of Grossbach. To be sure, her identity was previously unknown to the Defendant, but the expert witness disclosures of both parties have incorporated opinions which expressly relate to the professional competence of the Defendant's nursing staff, insofar as it related to Millen's post-surgical treatment and care.[4] In truth, the most that Grossbach's opinions will add to the blend of opinions, that have already been disclosed, is the particularized perspective of a professional nurse. Since—perhaps in knowing contemplation—the Defendant has already disclosed expert opinions, which appear to counter the substance of Grossbach's anticipated testimony, and has provisionally identified its nursing staff as prospective witnesses, we can envision no surprise or prejudice that would arise from the presentation of Grossbach's opinions, other than as we have otherwise expressly noted with respect to the attempted resuscitation of Millen.

Undoubtedly, the introduction of Grossbach's opinions will require some period of time, in which the Defendant can discover the bases for Grossbach's expected testimony, and can disclose any countering expert opinion evidence—that is, if it should choose to do either. Since, according to our Scheduling Order, this action shall not be "Ready for Trial" until May of 1977, no continuance, nor any other disruption of the District Court's calendar, will be occasioned by the allowance of Grossbach's opinion evidence.[5]

Next, the importance of Grossbach's opinion testimony rests in the parties' respective interests in demonstrating that the care of Millen was consistent with governing medical standards, or was professionally inadequate. Given the fact that each of the parties has proposed opinion evidence, by other designated experts, which addresses that issue, but from the perspective of different medical specialties, we cannot say that Grossbach's viewpoint, on that same topic, is unimportant. If properly founded, we have no hesitation in saying that Grossbach's testimony will "assist the trier of fact to understand the evidence or to determine a fact in issue." *Rule 702, Federal Rules of Evidence.*

Lastly, we find no evidence that the belated identification of Grossbach's opinions was motivated by bad faith, or was the product of a willful act of obstruction. At its worst, the failure to promptly identify Grossbach was the product of neglectfulness which, in and of itself, is an insufficient rationale for exclud-

**4.** The one notable exception is Grossbach's expected testimony that the resuscitation of Millen may not have been professionally performed. To allow such an expansion of the Plaintiff's claims, at this late date, is clearly prejudicial to the Defendant, even if the period of discovery were to be reopened. "Under Minnesota law, the plaintiff, "[i]n an action alleging malpractice * * * against a health care provider[,] which includes a cause of action as to which expert testimony is necessary to establish a prima facie case[,]" must, unless otherwise excused, "serve upon the defendant[,] with the summons and complaint[,] an affidavit" that expresses a qualified expert's opinion that the defendant "deviated from the applicable standard of care and that[,] by that action[,] caused injury to the plaintiff." " *Application of Sitter,* 167 F.R.D. 80, 81 (D.Minn.1996), quoting *Minnesota Statutes Section 145.682, Subdivisions 2 and 3(a).* Here, the

Plaintiff has candidly conceded that, until the proposed opinion testimony of Grossbach, she had asserted no claim that the attempted resuscitation of Millen was performed negligently. To allow such an expansion of her claims, at this belated juncture, without a formal Motion to Amend, would foster a circumvention of the governing State laws, and would unmistakably prejudice the Defendant's interests. Accordingly, the Defendant's Motion to Strike Grossbach's testimony, as it relates to any claimed malpractice in the performance of Millen's resuscitation, is granted.

**5.** To assure that the Defendant has an adequate time to evaluate the need to counter Grossbach's opinions, we will allow it to conduct a deposition of Grossbach, and to name one additional expert witness, **by no later than January 15, 1997.**

ing an untimely disclosed expert. *Tomlin v. Holecek*, supra at 136, citing and quoting *Citizens Bank v. Ford Motor Co.*, supra at 967.

NOW, THEREFORE, It is—

ORDERED:

1. That the Defendant's Motion to Strike [Docket No. 13] is granted as to that portion of Grossbach's testimony which relates to any claimed negligence in the Defendant's attempts to resuscitate Millen, and is denied in all other respects.

2. That, **by no later than January 15, 1997,** the Defendant shall disclose, consistent with the requirements of Rule 26(a)(2), Federal Rules of Civil Procedure, any expert opinion evidence which it proffers in response to the opinions of Grossbach, which have not been stricken by Order of this Court.